FILED IN CLERK'S OFFICE
U.S.D.C.  Atlanta

MAR 2 0 2009

JAMES W. HATTEN, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TRINA GIPSON,                          )
                                       )
        Plaintiff,                     )
v.                                     )
                                       )
ADMINISTRATIVE COMMITTEE OF            )       CIVIL ACTION NO.:
DELTA AIR LINES, INC. and THE          )       1:07-CV-1737-CC
DELTA FAMILY-CARE DISABILITY           )
AND SURVIVORSHIP PLAN,                 )
                                       )
        Defendants.                    )

## ORDER

This is an ERISA case.  The case is before the Court on
Defendants' Motion for Summary Judgment [18]; Plaintiff's Motion
for Summary Judgment [19]; and Defendants' Notice of Opposition
to Materials Outside Administrative Record [24].  After hearing
oral argument and reviewing the submissions of the parties, the
evidence of record, and the applicable law, the Court **SUSTAINS**
Defendants' Notice of Opposition to Materials Outside
Administrative Record, **GRANTS** Defendants' Motion for Summary
Judgment, and **DENIES** Plaintiff's Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Structure and Administration of the Plan

Defendant Delta Family-Care Disability and Survivorship Plan (the "Plan") is a non-contributory employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), established and maintained pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  (Defs.' Statement of Undisputed Material Facts ("DSMF") ¶ 1.)  It provides both Short-Term and Long-Term Disability Benefits, as well as other benefits, to non-pilot Delta employees.  (Id.)  Defendant Administrative Committee of Delta Air Lines, Inc. is the Plan Administrator and the Named Fiduciary (as those terms are defined in ERISA) for purposes of the Plan's operation and administration.  (Id.)

The Administrative Committee has the exclusive power to interpret the Plan and carry out its provisions.  (DSMF ¶¶ 4-5.)  Section 12.01 of the Plan states in part that:

> The operation and administration of the Plan ... the exclusive power to interpret it, and the responsibility for carrying out its provisions are vested in the Administrative Committee of at least three members, which Administrative Committee shall be the Administrator of the Plan....  The Administrative Committee shall establish rules for administration of the Plan and transaction of its business.  The Administrative Committee shall be the named

2

fiduciary of the Plan for purposes of
operation and administration of the Plan....

(DMSF ¶ 4.)   The powers and duties of the Administrative

Committee are defined further in Section 12.02 of the Plan,

which provides in relevant part:

In addition to powers and duties otherwise
stated in this Plan, the Administrative
Committee shall have such duties and powers
as may be necessary to discharge its
responsibilities under the Plan, including,
but not limited to, the following:

(a)   To establish and enforce such rules,
regulations, and procedures as it shall deem
necessary or proper for the efficient
operation and administration of the Plan;

(b)   The discretionary authority to
interpret and construe the Plan, and decide
all questions of eligibility of any Eligible
Family Member to participate in the Plan or
to receive benefits under it, its
interpretation and decisions to be final and
conclusive;

(c)   To determine the amount, manner, and
time of payment of benefits which shall be
payable to any Employee or Dependent, in
accordance with the provisions of the Plan,
and to determine the person or persons to
whom such benefits shall be paid;

* * *

(g)   To decide all questions concerning the
Plan;

* * *

(i)   To delegate all its power and duties as
set forth in Section 12.04.

3

> The Administrative Committee shall have the broadest discretionary authority permitted under law in the exercise of all of its functions including, but not limited to, deciding questions of eligibility, interpretation, and the right to benefits hereunder but shall act in an impartial and non-discriminatory manner with respect thereto.

(DSMF ¶ 5 (emphasis added).)  Section 12.03 also states that the Administrative Committee's decisions "as to interpretation and application of the Plan shall be final."  (Id.)

Sections 4.03 and 4.01 of the Plan set forth the eligibility criteria for Long-Term Disability Benefits.  Section 4.03 states, in relevant part, as follows:

> The Employee shall be eligible for Long Term Disability provided [s]he is disabled at that time as a result of demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent [her] from engaging in any occupation whatsoever for compensation or profit, including part-time work.

(DSMF ¶ 2.)  Section 4.01 of the Plan states that,

> "[a]n Employee who is eligible for . . . Long-Term Disability Benefits under the Plan shall be eligible for such benefits only so long as [s]he is under the care of a physician or surgeon for the injury or disease or pregnancy which is the disabling condition, complies with the prescribed treatment plan, and meets the other requirements of the Plan."

(DSMF ¶ 3.)

4

The Administrative Committee has delegated the initial
benefits determinations function to Aetna Life Insurance Company
("Aetna"), which reviews claims and monitors the continuous
nature of the disability.  (DSMF ¶ 6.)  If long-term disability
benefits are denied or discontinued, the claimant can seek
review of that decision by an appeal to Aetna.  (Id.)  If Aetna
upholds the denial, then the claimant may appeal the decision to
the Administrative Committee for a final determination.  (Id.)
At either level of review, the claimant may review Plan
documents and submit additional written evidence or arguments to
support the claim.  (Id.)

**B.   Plaintiff's Employment and Medical History**

Plaintiff is a former reservations agent for Delta.
(Administrative Record ("AR") at TG110, attach. to Arpin Decl.
at Ex. C.)  She last worked for Delta on April 21, 1995.  Upon
ceasing work at Delta, Plaintiff received short-term disability
benefits under the Plan, and on October 11, 1995, she began to
receive long-term disability benefits.  (AR at TG00110.)
Physician's statements from 1996 and 1997 reflect that Plaintiff
had been diagnosed with migraine headaches, major depression,
drug-induced arthritis, and generalized pain and fatigue.  (AR
at TG00134, 00154, & 00155.)

5

On August 23, 2001, Plaintiff's case was transferred to
Aetna, which had contracted with the Plan to manage the Plan's
disability files.  (AR at TG00197.)  On that same date, Aetna
sent a letter to Plaintiff's treating rheumatologist, Dr.
Frederic McDuffie, to request clinical information.  (Id.)
Nearly one year later, on July 16, 2002, Aetna spoke with Dr.
McDuffie's office and learned that he had retired three years
beforehand and that they had no medical records for Plaintiff.
(AR at TG00196.)  In August and September 2002, Aetna contacted
Plaintiff to obtain information regarding the identity of her
treating physicians.  (AR at TG00194-95.)  During this time
period, Plaintiff's certification for long-term disability
benefits was extended to allow time for obtaining clinical
information.  (AR at TG00194-96.)

Among the physicians whom Plaintiff identified in response
to Aetna's requests was rheumatologist Dr. Rantandeep Singh,
whom she had begun seeing in 1999 on three to four month
intervals.  (AR at TG00275-314.)  Throughout his treatment of
Plaintiff, Dr. Singh maintained that she was totally disabled
from any work, including part-time work.  However, Dr. Singh's
medical records that were submitted to Aetna were conclusory and
lacked an objective assessment of Plaintiff's physical or
functional capacity.  For example, in Provider Statements that

6

Dr. Singh submitted to Aetna in January and June 2003, Dr. Singh indicated Plaintiff was unable to perform any work due to her complaints of "chronic pain" and "fatigue." (AR at TG00313-314.) Likewise, in response to an Aetna questionnaire dated September 3, 2003, Dr. Singh stated that Plaintiff was totally disabled from any occupation including part-time work, yet described her functional limitations merely as "chronic pain/fatigue/chronic discomfort." (AR at TG00194.)

Also, in an Attending Physician Statement dated November 11, 2003, Dr. Singh stated that Plaintiff's symptoms included "severe fatigue and chronic pain." (AR at TG00308-10.) He described Plaintiff's abilities and limitations as being unable to work with others, to give supervision, or to work cooperatively with others in a group setting. (AR at TG00310.) Dr. Singh – who was not a mental health practitioner but a rheumatologist – did not indicate specifically whether Plaintiff had any physical limitations that affected her ability to perform work. (Id.) Rather, he noted that Plaintiff "is in constant pain, fatigue and chronic discomfort," that Plaintiff's "chronic fatigue" substantiated her "impairment," and that she consequently "cannot work." (Id.)

On January 30, 2004, at the request of Aetna, rheumatologist Michael Friedman, M.D., conducted an Independent

7

Medical Evaluation ("IME") of Plaintiff and produced a detailed
report based on his review of Plaintiff and her medical records.[1]
(AR at TG00201-211.)   In his report, Dr. Friedman questioned
Plaintiff's credibility:

> For a variety of reasons this claimant
> represents a very difficult case to analyze.
> There is not a single feature that can be
> pointed to, but, taken as a whole, her story
> is quite bizarre.  Among some of the more
> unusual, and ambiguous, statements she made
> was one to me during the course of the
> interview that had she never left Dr. Fowler
> [her previous primary care physician] she
> wouldn't "be here today."  It is hard to
> tell whether she meant her problem would
> have been diagnosed and cured, whether her
> problem would have been prevented, whether
> her disability status would have been
> assured without the necessity for
> independent review, or whether she would not
> be alive to be present at this TIME.  The
> latter would seem less likely, of course,
> given that she had nothing but praise for
> Dr. Fowler, but her words remain.  In a
> similar fashion, she once remarked to Dr.
> Singh that she wished she could be "hooked
> up to a Demerol drip."  Does this mean that
> she was in severe pain at the time or that
> she was seeking some sort of assisted
> suicide?  Ultimately, her words raise the
> question as to her credibility as a reliable
> observer and communicator of her symptoms.
> In other words, decisions made regarding her
> level of disability will need to be based
> primarily on objective and verifiable

---

[1] The administrative record reflects that Plaintiff was
instructed to bring all relevant medical records dating back to
the original inception date of her disability to the
examination.   (AR at TG00204.)

observations and documentation rather than
the claimant's statements.[2]

(AR at TG00207.)  Dr. Friedman, after enumerating Plaintiff's

multiple diagnoses and cataloging her medications, concluded:

> I see no reason why this claimant should not
> immediately return to part time, sedentary
> employment with some accommodations made for
> the possibility that she might develop an
> intractable headache on the job.  If her
> situation improves, she could, perhaps over
> a six-month period, increase her work time.
> She says she was once a jogger, and
> apparently, participates in Yoga, etc. to
> help her deal with her chronic pain so might
> even, with some encouragement, increase the
> physical level of her work in time.

(AR at TG00208.)  Dr. Friedman concluded his report by noting the

additional care that could be provided to Claimant that would

permit further evaluation of her in the future.   (AR at TG00208.)

As part of the IME, Dr. Friedman also completed a

Functional Capacity Worksheet indicating that Plaintiff could

"frequently" (2.5 to 5.5 hours per 8-hour workday) grasp her

---

[2] The Administrative Record reflects that Dr. Friedman was not
the first physician to question Plaintiff's credibility and
motives.  H. A. Selvey, M.D., who conducted a psychiatric
evaluation of Plaintiff on March 27, 1997, questioned
Plaintiff's credibility and whether she even suffered from a
"demonstrable" injury or disease.  (AR at TG00136-150.)   Dr.
Selvey further stated that Plaintiff appeared to him to be a
"narcissistic young lady who wants no demands whatsoever made on
her and basically wants whatever she wants, whenever she wants
it" and that she developed her "quasi-medical condition to
justify demanding that for which she becomes entitled."   (AR at
TG00147-48.)

hands, sit and stand; that she could frequently lift one to five pounds of weight, and occasionally six to ten pounds; and that she could operate a car.  (AR at TG00211.)  He also noted that Plaintiff was capable of working four hours per day.  (Id.)

Aetna also ordered surveillance to be conducted of Plaintiff.  (AR at TG00213.)  On January 30, 2005, following the examination by Dr. Friedman, surveillance recorded Plaintiff driving her car, running errands, walking with a normal gait, and entering and exiting her car without any sign of discomfort. (AR at TG00213, 00215.)  She was also observed carrying grocery bags in each hand as well as her purse and transferring the bags to her left hand.  (AR at TG00215.)  Ten minutes later, Plaintiff was seen carrying all the bags in her right hand and clutching other items to her chest.  (AR at TG00213, 00215.)

## C.   Discontinuation of Benefits and Plaintiff's Administrative Appeals

On February 13, 2004, Aetna informed Plaintiff that she no longer met the definition of disability on the grounds that she was not totally disabled from any occupation, including part-time work.  (AR at TG00182.)  Plaintiff appealed Aetna's initial denial of benefits and submitted additional information to support her claim.  (AR at TG00178, 00180.)

10

Among the information that she submitted was a copy of an
IME ordered by the Social Security Administration and performed
by Dr. Valerie McAdams on August 2, 2003.  Dr. McAdams observed
that Plaintiff was depressed and lived in isolation, had
interpersonal difficulties and recommended that Plaintiff
"engage in support of insight oriented therapy to address coping
skills and/or medication that may help with depression."  (AR at
TG00099.)  She stated that it was likely that Plaintiff "will
not be a productive employee at this time due to poor adjustment
to her illness."  (Id.)  Nonetheless, Dr. McAdams observed that
Plaintiff was physically capable of attending to her personal
needs and attending, albeit slowly, to household chores.  (Id.)
She also noted that although Plaintiff had some occasional
problems with walking, "she is able to bend, stoop and reach
without undue difficulty."  (Id.)

Plaintiff also submitted office notes from Dr. Singh dated
January 21, 2003, May 15, 2003, August 19, 2003, and December 1,
2003, all of which indicated that Plaintiff complained of
fibromyalgia and chronic pain.  (AR at TG00299-306.)  The office
visit notes were silent as to Plaintiff's physical limitations
and abilities, with one exception:  office visit notes dated
August 19, 2003 indicate that Plaintiff had "started doing

11

'Yoga' on a regular basis" and had "started 'working out.'"   (AR
at TG00303.)

Plaintiff also submitted a letter dated November 27, 2000
from psychiatrist Dr. Chris Riddell to Dr. Singh.   In this
letter, Dr. Riddell advised that Plaintiff had symptoms
comparable with major depression, but that she had refused to
follow Dr. Riddell's prescribed regimen of medication management
and psychotherapy.   (AR at TG00307.)

On April 7, 2004, Dr. Singh submitted to Aetna a letter in
which he stated that Plaintiff had been diagnosed with
depression and fibromyalgia syndrome and that she had been
"medically advised to follow-up with a Psychotherapy Center for
treatment."   (AR at TG00127.)   Dr. Singh also noted: "At this
time, [Plaintiff] is unable to work on a full or even part-time
basis"; however, Dr. Singh again made no mention of Plaintiff's
functional capacities.   (Id.)   Nothing in the administrative
record reflects that Plaintiff in fact engaged in the prescribed
psychotherapy mentioned in Dr. Singh's April 7, 2004 letter.

In a letter dated June 17, 2004, Aetna denied Plaintiff's
appeal.   (AR at TG00122-24.)   Plaintiff appealed this
determination to the Administrative Committee by letter dated
September 16, 2004, but provided no further medical information
as part of her appeal.   (AR at TG00117.)   On February 8, 2005,

12

the Administrative Committee upheld the denial of Plaintiff's long-term disability benefits effective as of February 14, 2004. (AR at TG00001-00009.)  The Administrative Committee found that the weight of the medical information presented suggested that Plaintiff was not unable to perform any job as of February 14, 2004.  (AR at TG00009.)

In reaching its decision, the Administrative Committee observed that Dr. Selvey, nearly seven years beforehand, had clearly opined that Plaintiff had no demonstrable disease or injury, which is a requirement for long-term disability benefit eligibility.  (AR at TG00003.)  The Administrative Committee also observed that the reports from Dr. Singh were all very brief and conclusory, and that none of the reports explained or elaborated on his opinion that Plaintiff was completely disabled.  (AR at TG00004.)

The Administrative Committee acknowledged that a conflict existed between the opinions of Dr. Singh and Dr. Friedman.  (AR at TG00007-A.)  The Administrative Committee resolved this conflict by recognizing that Dr. Singh is Plaintiff's physician; that Dr. Friedman's analysis was more thorough than the summary conclusions from Dr. Singh; that Dr. Singh's office notes indicated that Plaintiff was performing Yoga on a regular basis and was working out which was consistent with Dr. Friedman's

analysis; and that surveillance records showed Plaintiff performing activities and movements.  (AR at TG00007-A to 8.) The Administrative Committee was thus persuaded that despite Plaintiff's rheumatic disorders, as of February 14, 2004, she was able to engage in part-time, sedentary work.  (AR at TG00008.)

The Administrative Committee also found that the record did not contain any evidence to suggest that Plaintiff's depression precluded her from performing any occupation whatsoever, including part-time sedentary work.  (AR at TG00008.)  The Administrative Committee also noted that the record indicated that Plaintiff did not comply with Dr. Riddell's prescribed regimen for treating her depression.  (AR at TG00004, 00008.) Thus, the Administrative Committee concluded that even if Plaintiff had shown she were unable to engage in any occupation whatsoever, she would still not be eligible for long-term disability benefits because she had failed to follow the prescribed treatment program.  (AR at TG00009.)

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper when "the pleading, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court's task on motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Since the Court's review is limited to the undisputed administrative record before it, the Court finds that this case is ripe for disposition on the parties' cross motions for summary judgment. See <u>Wile v. Paul Revere Life Ins. Co.</u>, 410 F. Supp. 2d 1313, 1318-19 (N.D. Ga. 2005) (considering case brought pursuant to ERISA under Rule 56).

**B.   <u>Applicable Standard of Review</u>**

Until recently, courts in this Circuit applied the following six-step analysis to review an ERISA plan administrator's benefits determination:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1356 (11th Cir. 2008) (quoting Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1138 (11th Cir. 2004)).  The Supreme Court's decision in Metropolitan Life Ins. Co. v. Glenn, -- U.S. --, 128 S. Ct. 2343 (2008), has altered this framework by relegating the existence of a conflict of interest to merely a factor in whether the administrator's decision was arbitrary and capricious.  Doyle, 542 F.3d at 1360; White v. Coca-Cola Co., 542 F.3d 848, 854 (11th Cir. 2008).  Glenn does not affect, however, the Court's analysis in the case at bar since the parties agree that the Plan (1) vests the Administrative Committee with discretionary authority to interpret the Plan and

make benefit eligibility determinations and (2) does not operate under a conflict of interest. (<u>See</u> Pl.'s Br. Supp. Pl.'s Mot. Summ. J. at 17-18 n. 7; Mem. Law Supp. Defs.' Mot. Summ. J. at 16 n.66.) Accordingly, the Court finds, consistent with existing Eleventh Circuit authority involving this very Plan, that the deferential arbitrary and capricious standard of review applies to the decision to discontinue Plaintiff's receipt of long-term disability benefits. <u>Townsend v. Delta Family-Care Disability & Survivorship Plan</u>, 295 Fed. Appx. 971, 975-76 (11th Cir. 2008) (holding that the appropriate standard of review for this Plan is the arbitrary and capricious standard of review and that no conflict of interest exists); <u>Turner v. Delta Family-Care Disability & Survivorship Plan</u>, 291 F.3d 1270, 1273 (11th Cir. 2002); <u>Paramore v. Delta Air Lines</u>, 129 F.3d 1446, 1449 (11th Cir. 1997).

**C.   <u>Materials Outside the Administrative Record</u>**

As a preliminary matter, the Court addresses Defendants' opposition to the Court's consideration of documents attached as Exhibit A to Plaintiff's motion for summary judgment. (<u>See</u> Pl.'s Mot. Summ. J. Ex. A.) The parties do not dispute that none of these materials was before the Administrative Committee at the time of its decision on Plaintiff's appeal. And, as

17

explained above, the plan administrator's decision here is
subject to the arbitrary and capricious standard of review.

Under the arbitrary and capricious standard of review the
Court may consider in its analysis only the information was
known to or submitted to the Administrative Committee at the
time of its decision.  Townsend, 295 Fed. Appx. at 976; Glazer
v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th
Cir. 2008) ("The court must consider, based on the record before
the administrator at the time its decision was made, whether the
court would reach the same decision as the administrator.")
Since the materials attached as Exhibit A to Plaintiff's motion
for summary judgment were indisputably not before the
Administrative Committee, they are not part of the
administrative record and will not be considered.  Accordingly,
the Court **SUSTAINS** Defendants' Notice of Objection to Materials
Outside administrative record.

D.    **Application of Law**

Considering first whether it would have reached the same
decision as the Administrative Committee, the Court concludes
that the decision to discontinue Plaintiff's long-term
disability benefits was not "wrong."  Under ERISA, the claimant
has the burden of proving entitlement to disability benefits.
Horton v. Reliance Standard Life Ins. Co., 141 F.3d 1038, 1040

(11th Cir. 1998) (per curiam).  In order to determine whether the decision to deny benefits to Plaintiff was de novo wrong, the Court stands in the shoes of the administrator and gives fresh consideration to all the evidence before the administrator.  See Stiltz v. Metropolitan Life Ins. Co., Civil Action File No. 1:05-CV-3052-TWT, 2006 WL 2534406, at *6 (N.D. Ga. Aug. 30, 2006).  Having considered the evidence that was before the Administrative Committee in this case, the Court concludes that Plaintiff failed to meet her burden of proving that she is totally disabled within the meaning of the Plan.

Here, the administrative record contains documents indicating that Plaintiff has a long history of treatment by Dr. Singh and other physicians for fibromyalgia and other medical conditions, but the Court finds that the medical records, letters, and forms submitted by Dr. Singh, Plaintiff's most recent treating physician, are largely conclusory and lack objective findings regarding Plaintiff's physical or functional capacity.  Even when Dr. Singh was asked to provide objective findings that substantiated Plaintiff's impairment, Dr. Singh failed to provide such findings.  By way of example, on the Attending Physician Statement dated November 11, 2003, that Dr. Singh completed at the request of Aetna, he described Plaintiff's symptoms as "severe fatigue and chronic pain."  (AR

19

at TG00309.)   When asked what medical restrictions or
limitations he was placing on Plaintiff, he wrote "[Patient] is
in constant pain, fatigue and chronic discomfort."   (AR at TG
00310.)   And when asked to identify the objective findings that
substantiated impairment, he stated simply "chronic fatigue."
(Id.)   As with Dr. Singh's other records in the administrative
record, these findings appear to be based on Plaintiff's
subjective complaints rather than objective data.   While these
records might be sufficient to show that Plaintiff actually had
the medical conditions of which she complained, the records fail
to explain or support Dr. Singh's conclusion that Plaintiff
cannot work.

      The administrative record also includes ample evidence
spanning a long period of time that Plaintiff's subjective
complaints may be embellished and lacking in credibility.   As
early as 1997, Dr. Selvey questioned Plaintiff's credibility and
whether she suffered from a "demonstrable" injury or disease.
(AR at TG00136-150.)   This skepticism was echoed in Dr.
Friedman's IME of January 2004.   (AR at TG00207.)   Therefore,
Plaintiff's subjective complaints do little to help her to meet
her burden of showing total disability.

      While Plaintiff has been awarded disability payments by the
Social Security Administration ("SSA"), this is not dispositive

of whether she is entitled to benefits under the Plan.  As a
threshold matter, the administrative record does not contain a
copy of the award of Social Security benefits; thus, the
Administrative Committee had no findings to consider nor any
information regarding what evidence the SSA considered and how
the evidence was weighed.  But even if Plaintiff had submitted
the findings of the SSA, they would not be binding on the
Administrative Committee because the rules and regulations
applicable to the SSA, especially the treating physician rule,
simply do not apply to ERISA fiduciaries.  See Black & Decker
Disability Plan v. Nord, 538 U.S. 822, 830-32 (2003); Paramore,
129 F.3d at 1452 n.5.

   Based on the evidence specifically mentioned above and the
other evidence contained in the administrative record relied on
by Plaintiff, the Court finds that Plaintiff has not met her
burden of showing that she is disabled under the terms of the
Plan.  See Horton, 141 F.3d at 1040; see also Onofrieti v.
Metro. Life Ins. Co., 320 F. Supp. 2d 1250, 1254 (M.D. Fla.
2004) (holding that the burden to show entitlement to benefits,
even when there has been a past payment of benefits, rests at
all times with the claimant).[3]

_____

[3] Regardless of whether the past receipt of benefits is a factor
that a plan administrator must consider when determining whether

In contrast to Plaintiff's failure to demonstrate that she is disabled under the Plan, Dr. Friedman's IME indicates that Plaintiff was not disabled and could perform work on a part-time basis with limited restrictions that were expected to be needed only through August 31, 2004.  (AR at TG00202.)  Dr. Friedman's opinion was based on objective findings and his review of the records that Plaintiff brought with her to her appointment.[4] Although the Court believes that Dr. Friedman's opinion that Plaintiff could return to work was somewhat qualified with the possibility that additional information might affirm or contradict his opinion, Plaintiff had Dr. Friedman's IME in her possession well in advance of the resolution of both of her administrative appeals and had the opportunity to supplement the record.  (AR at TG00049 (letter indicating that as of March 3, 2004 Plaintiff was in receipt of Dr. Freidman's IME), TG00108, 00115, and 00119.)  Having been placed on notice that she was free to submit additional documentation and statements that

---

a claimant has met his or her burden to prove continuing disability, the Court's result under the undisputed record in the instant case would be the same.

[4] Significantly, it was Plaintiff's responsibility to bring the relevant medical records with her to the IME.  Plaintiff was specifically reminded that "it is imperative that you take with you all your relevant medical records" and that her records "must date back to the original inception date of your disability."  (AR at TG00204.)

might influence the determination of whether she would be deemed able to return to work on a part-time basis, Plaintiff should have sought to provide this additional information.  See Townsend, 295 Fed. Appx. at 977 (noting that any shortcomings in the administrative record fall on the claimant to correct).  In the absence of such information, even Dr. Friedman's qualified opinion, which was based on objective findings, carried greater weight than Dr. Singh's opinion, which has a dearth of objective data to support it.

Finally, while the surveillance evidence is not outcome-determinative, it nonetheless tends to show that Plaintiff was capable of performing part-time work and casts further doubt on Dr. Singh's conclusory opinions.  See Barchus v. Hartford Life & Accident Ins. Co., 320 F. Supp. 2d 1266, 1287 (M.D. Fla. 2004) (finding surveillance probative where plaintiff was observed walking short distances, pushing a grocery cart, driving a car, bending at her knees to pick up items off the ground, and loading groceries into the trunk of her car).

For these reasons, the Court finds that the Administrative Committee's benefits decision was not wrong.  But even if the decision were wrong, the above-mentioned evidence unequivocally refutes a finding that the benefits determination was arbitrary and capricious.  "'As long as a reasonable basis appears for

[the] decision [of the Committee], it must be upheld as not being arbitrary or capricious, even if there is evidence that would support a contrary decision.'" White, 542 F.3d at 856 (quoting Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1140 (11th Cir. 1989)).  As explained above, ample record evidence supports the finding that the Administrative Committee's decision had a rational, good faith basis. Accordingly, summary judgment is due to be granted in favor of Defendants.

### III.   CONCLUSION

For the above-stated reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, **DENIES** Plaintiff's Motion for Summary Judgment, and **SUSTAINS** Defendants' Notice of Opposition to Materials Outside Administrative Record.

SO ORDERED, this 20th day of March, 2009.

CLARENCE COOPER
UNITED STATES DISTRICT JUDGE